**Lawrence LEYBA, Plaintiff,**

v.

**Hartmut RENGER, Anesthesia Specialists of Albuquerque, a New Mexico partnership and St. Joseph's Healthcare Corp., a New Mexico corporation, Defendants.**

**No. CIV 90–0252 LH/LFG.**

United States District Court,
D. New Mexico.

Aug. 23, 1994.

See also 874 F.Supp. 1218.

Joseph Goldberg, Raymond G. Sanchez, Freedman, Boyd, Daniels, Peifer, Hollander, Guttman & Goldberg, Albuquerque, NM, for plaintiff.

Peter H. Johnstone, Thomas C. Bird, Russell Moore, Keleher & McLeod, P.A., E.W. Shepherd, Hatch, Allen & Shepherd, Albuquerque, NM, for defendant Renger.

Ranne B. Miller, Miller, Stratvert, Torgerson & Schlenker, P.A., Albuquerque, NM, for defendant ASA.

D. James Sorenson, Sorenson & Rhoades, Albuquerque, NM, for defendant SJH.

### MEMORANDUM OPINION

HANSEN, District Judge.

THIS MATTER is before the Court on the following three motions filed by Defendants on February 18, 1992: 1) Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Tying Arrangement Claim (Docket No. 171); 2) Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Monopolization Claim (Docket No. 173); and, 3) Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Group Boycott Claim (Docket No. 177).

Having reviewed the memoranda of the parties and their exhibits, and being fully apprised of the applicable law, the Court finds that Defendants are entitled to summary judgment on the tying arrangement claim, that defendants are entitled to summary judgment on the monopolization claim, and that defendants are entitled to summary judgment on the group boycott claim.[1]

This case arises out of St. Joseph's Healthcare Corp.'s (hereafter "St. Joseph") acquisition of Heights General Hospital ("Heights") in the Spring of 1988. St. Joseph is staffed predominantly by allopathic physicians while Heights had been staffed by osteopathic physicians. Plaintiff, Dr. Lawrence Leyba, is an osteopathic anesthesiologist who had practiced at Heights for approximately twelve years prior to the acquisition. Defendant Anesthesiology Specialists of Albuquerque (hereafter "ASA") had an exclusive contract with St. Joseph whereby it was agreed that ASA would be the sole provider of anesthesiology services at all St. Joseph hospitals. Defendant, Dr. Hartmut Renger, was the managing partner of ASA at the time.

Plaintiff commenced this lawsuit on March 13, 1990, claiming that the actions of Defendants violate state and federal antitrust laws.[2] The factual basis for Plaintiff's claims is that he was denied staff privileges at St. Joseph after the acquisition of Heights and that he was denied acceptance into ASA. Plaintiff claims that these denials were improperly motivated for anticompetitive purposes and resulted in him being excluded from practicing anesthesia in New Mexico. Plaintiff specifically claims that the exclusive agreement between ASA and St. Joseph created an illegal tying arrangement, that the defendants attempted to and did monopolize the provision of anesthesiology services in the Albuquerque metropolitan area, and that defendants engaged in a group boycott in an attempt to exclude Plaintiff from the market.

1. Plaintiff brought his antitrust claims under both state and federal statutes. The New Mexico antitrust statute, NMSA 1978, § 57-1-15, is construed in harmony with the federal law. Hence, the Court's conclusions as to the federal antitrust claims apply equally to the state claims.

2. Plaintiff also brought claims of defamation and tortious interference with contractual relations.

After a brief discussion of the facts, each of these claims is addressed below.[3]

### Factual Background

In the Spring of 1988, St. Joseph, a predominantly allopathic health care provider, acquired the Heights hospital, which was then known as an osteopathic hospital. As a result of the acquisition, St. Joseph mandated that all physicians with staff privileges at Heights be required to reapply for privileges under the St. Joseph system. With regard to any Heights' anesthesiologists who wished to continue practicing at Heights, there were two requirements. First, because of the exclusive agreement between ASA and St. Joseph, anesthesiologists wishing to practice at any of the three St. Joseph facilities would need to be a member of the ASA group. Second, because ASA exclusively provided anesthesiology services for St. Joseph, an anesthesiologist who wished to practice at St. Joseph needed to have staff privileges at all three hospitals.

When Plaintiff first learned that St. Joseph intended to acquire Heights and that ASA's exclusive agreement would be extended to cover Heights, he became concerned that he would no longer be allowed to practice at that hospital. Plaintiff's concern stemmed from his belief that Dr. Renger, managing partner of ASA, held negative views of osteopathic physicians and would not allow Plaintiff to join ASA. Apparently, prior to even seeking membership in ASA, Plaintiff applied for staff privileges at all three St. Joseph hospitals. In March of 1988, the credentials committees of the three hospitals met to consider Plaintiff's application and voted to deny him privileges.

There is no indication from the record that St. Joseph's agreement with ASA played any part in the denials of privileges. Instead, the decisions were based upon Plaintiff's alleged inadequate training and upon adverse letters of recommendation. In June of 1988, Plaintiff was eventually granted privileges at Heights and at St. Joseph's West Mesa hospitals. It was not until November of 1988, however, that Plaintiff was finally granted

privileges at St. Joseph's downtown facility. By that time, Plaintiff claims, his practice had been destroyed. Based upon the initial denials and the subsequent delays in granting of privileges, Plaintiff brings his claims.

### Standard for Summary Judgment

To prevail on their motions for summary judgment, the defendants must first demonstrate the absence of a genuine issue of material fact. Upon such a showing, the plaintiff may not rest upon mere allegations or denials of the defendants' pleadings, but must set forth specific facts showing that there is a genuine issue for trial. Fed. R.Civ.P. 56(e). If the plaintiff does not show that a genuine issue of material fact exists, then summary judgment shall be entered against him. *Id.*

### I. *TYING ARRANGEMENT CLAIM.*

Counts II and III of Plaintiff's complaint allege that Defendants, Dr. Renger, ASA and St. Joseph, "have contracted, combined and conspired with others in an unreasonable restraint of trade or commerce in violation of Section 1 of the Sherman Act" and "in violation of N.M. Stat. Section 57–1–1 (1987)." Complaint ¶¶ 43, 48. These allegations encompass Plaintiff's federal and state tying arrangement claims.

In essence, Plaintiff claims that the exclusive contract between ASA and St. Joseph resulted in an illegal tying arrangement. Defendants contend that they are entitled to summary judgment on the tying arrangement claim because no illegal tying arrangement exists between St. Joseph and ASA and because the arrangement between St. Joseph and ASA is not per se illegal.

#### A. *Existence of a Tying Arrangement.*

"A so-called tying arrangement exists when a seller conditions the sale of one product or service, the tying product or service, on the buyer's purchase of another product or service, the tied product or service." *Beard v. Parkview Hosp.*, 912 F.2d 138, 140 (6th Cir.1990) (*citing Northern Pac. Ry. Co.*

---

Those claims were addressed in an opinion dated May 18, 1994.

**3.** Additional facts are contained in the May 18, 1994 opinion.

*v. United States,* 356 U.S. 1, 5–6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958)).

> [T]he essential characteristic of an invalid tying arrangement lies in the seller's exploitation of its control over the tying product to force the buyer into the purchase of a tied product that the buyer either did not want at all, or might have preferred to purchase elsewhere on different terms. When such 'forcing' is present, competition on the merits in the market for the tied item is restrained and [the antitrust laws are] violated.

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde,* 466 U.S. 2, 12, 104 S.Ct. 1551, 1558, 80 L.Ed.2d 2 (1984).

■ No illegal tying arrangement can exist, however, unless the supplier of the tying product or service receives a direct economic benefit from the sale of the tied product or service. *See Beard v. Parkview Hosp.,* 912 F.2d 138 (6th Cir.1990); *White v. Rockingham Radiologists, Ltd.,* 820 F.2d 98 (4th Cir.1987). Defendants contend that, pursuant to the exclusive agreement, St. Joseph receives no part of the revenues earned by ASA and thus receives no economic benefit.

■ In an attempt to controvert that statement of fact, Plaintiff states as follows:

> The St. Joseph administration believes it benefits from the exclusive contract it has with its anesthesiologists. The St. Joseph–ASA contract requires that ASA charge reasonable and customary fees, which protects St. Joseph from losing patients because of outrageous fees being charged by the physicians on its medical staff. The contract provides St. Joseph some desirable 'leverage' over its anesthesiologists, and provides what the hospital administration perceives to be more reliable coverage than would be provided by anesthesiologists practicing independently.

Plaintiff's Counterstatement of Material Facts, ¶ 1. Such indirect benefits are insufficient to create a genuine issue of material fact as to whether St. Joseph received direct economic benefits from ASA as a result of the exclusive agreement. *Scara v. Bradley Memorial Hosp.,* 1993–2 Trade Cases 70,353, 1993 WL 404150 (E.D.Tenn.1993). Hence, as a matter of law, Defendants are entitled to summary judgment on Plaintiff's federal and state tying arrangement claims.

**B. *Per Se Illegality.***

Even if the direct benefits rule did not apply here, Defendants contend that the contractual arrangement between St. Joseph and ASA is not per se illegal under the Sherman Act because St. Joseph does not enjoy a sufficient market share with regard to the tying product or service—that is, medical procedures provided at the hospital which require the services of an anesthesiologist.

■ Tying arrangements are said to run afoul of the antitrust laws "when the seller has some special ability—usually called 'market power'—to force a purchaser to do something that he would not do in a competitive market." *Jefferson Parish,* 466 U.S. 2, 13–14, 104 S.Ct. 1551, 1559 (citations omitted). "Per se condemnation" of a tying arrangement is therefore appropriate when the existence of forcing is probable. *Id.* at 15, 104 S.Ct. at 1560.

As stated by the Supreme Court,

> When the seller's share of the market is high, or when the seller offers a unique product that competitors are not able to offer, the Court has held that the likelihood that market power exists and is being used to restrain competition in a separate market is sufficient to make *per se* condemnation appropriate.... When, however, the seller does not have either the degree or the kind of market power that enables him to force customers to purchase a second, unwanted product in order to obtain the tying product, an antitrust violation can be established only by evidence of an unreasonable restraint on competition in the relevant market.
>
> [A]ny inquiry into the validity of a tying arrangement must focus on the market or markets in which the two products are sold, for that is where the anticompetitive forcing has its impact.

*Id.* at 17–18, 104 S.Ct. at 1560–61.

In sum, if patients are forced to purchase ASA's services because of St. Joseph's mar-

ket power, then the arrangement would be said to have anticompetitive consequences. Conversely, if no forcing is present, and patients are free to enter a competing hospital and utilize another anesthesiology group, then there has been no antitrust violation. *Id.* at 25, 104 S.Ct. at 1565. The tied product in this instance is anesthesiology services provided by ASA. The focus, therefore, is upon St. Joseph's market power in the relevant product market for the tying product; *i.e.,* those hospital services provided by St. Joseph to its patients which require the anesthesiology services of ASA.[4]

It is uncontested that the Albuquerque, New Mexico, metropolitan area is the relevant geographic market in which St. Joseph competes. Plaintiff's Memorandum on Monopolization Claim, ¶ 14. In that geographic market there are seven hospital systems available to the consumer. They are Lovelace Medical Center, Southwest Community Health Services ("Presbyterian"), St. Joseph, UNM Hospital, the New Mexico Federal Medical Center ("VA Hospital"), Indian Health Service Hospital, and the United States Air Force Hospital at Kirtland. Of those seven, the VA Hospital, Indian Health Service Hospital, and the United States Air Force Hospital, serve limited segments of the consumer population and Plaintiff concedes that they are not a part of the relevant market in this case. Plaintiff's Memorandum on Monopolization Claim, ¶¶ 13, 14.

In their motion for summary judgment on the tying arrangement claim, Defendants contend that as a matter of law St. Joseph lacks market power in the relevant market for the tying product, and that the arrangement is therefore not per se illegal. In support of this contention, Defendants have put forth the following:

> Market share for anesthesiology services can best be measured by hospital discharges in the areas of hospital services most related to surgical procedures (which are medical-surgical, obstetrics, and pediatrics). This information has been compiled by the New Mexico Hospital Association. This data has been analyzed by Dr.

McCarthy, the Defendants' expert in antitrust economics. Dr. McCarthy concluded that, relying on the relevant discharge and outpatient surgery data, at no time during the relevant period of time has St. Joseph and ASA controlled more than 23% of the market for anesthesiology services in the Albuquerque area.

Defendants' Memorandum on Tying Arrangement Claim, ¶ 5.

In essence, Defendants' statement of fact is that those hospital services most related to surgical procedures, and thus, necessitating anesthesiology services, are medical-surgical, obstetrics, pediatrics, and outpatient surgery. Furthermore, they contend that during the relevant period of time, St. Joseph controlled no more than 23 percent of the market for those hospital services requiring anesthesiology. Defendants claim, therefore, that since St. Joseph has never had more than 23 percent of the market for the tying product, its arrangement with ASA cannot, as a matter of law, be per se illegal.

To controvert these facts, Dr. Leyba baldly states that,

> Based on the facts and for the reasons outlined in his Memorandum Brief in Opposition to Defendants' Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Monopolization Claim ... it is clear that defendants control a substantially greater share of the relevant market in this case. Even assuming defendants' market definition, which Dr. Leyba disputes, defendants' share of the market is greater than 23%.

Plaintiff's Corrected Memorandum on Tying Arrangement at 1. In seeking to defeat summary judgment on the issue of per se illegality, Plaintiff relies entirely upon his brief on monopolization.

Looking to Plaintiff's monopolization brief, Plaintiff apparently contends that the information relied upon by Defendants in determining market share for the tying product is flawed. Specifically, Plaintiff points to the numbers of cases in which anesthesiology services were actually administered at St.

---

4. In this case, just as in *Jefferson Parish,* the provision of anesthesia services at the hospital is a medical service which *is* separate from the other services provided by St. Joseph.

Joseph in 1988 as indicating that the numbers relied upon by Defendants are too low, resulting in a lower market share. Plaintiff's Memorandum on Monopolization Claim, ¶ 22.

For example, Plaintiff notes that the 1988 figures, relied upon by Defendants as most indicative of surgical procedures requiring anesthesiology at St. Joseph, would signify that 15,286 patients required anesthesiology. However, Plaintiff points out that St. Joseph has admitted that the actual number of cases in which anesthesiology was administered at St. Joseph in 1988 was 22,970.

What Plaintiff has not accounted for is the fact that Defendants' expert has specifically stated that figures for outpatient surgery were not available for 1988. Hence, those figures were not included in the discharge summary prepared by NMHA. When looking at the figures for 1990, the first year data was available for outpatient surgery, it is readily apparent that NMHA's utilization reports are consistent with St. Joseph's discharge figures. When the figures for both inpatient and outpatient discharges are included in the determination of 1990 market share for the tying product, St. Joseph still has less than 25 percent of the market.[5] McCarthy Affidavit, ¶ 2(f).

Plaintiff has not disputed Defendants' contention that the hospital services which are most related to surgical procedures requiring anesthesia are medical-surgical, obstetrics, pediatrics, and outpatient surgery. Plaintiff has not disputed that the discharge figures for such services are indicative of the anesthesiology services provided at St. Joseph. Plaintiff merely challenges Defendants' figures for 1988 because they apparently do not account for outpatient surgery.

Plaintiff has not adequately set forth specific facts to dispute Defendants' description of the relevant product market for the tying product and has failed to show that St. Joseph's market share for the tying product gives rise to a probability of forcing. Plain-

tiff simply concludes that Defendants' market share calculation is based upon data of questionable relevance and is also "probably too low."

■ The facts put forth by Defendants indicate that St. Joseph's market share of the relevant product market for the tying product is somewhere between 23 percent and 25 percent. Plaintiff has come forward with no evidence which would show that St. Joseph's market share exceeds 25 percent. Even 25 percent of the relevant market does not represent the kind of market dominance which would permit St. Joseph to exploit its control over the tying product and force patients to purchase the services of ASA. *Jefferson Parish,* 466 U.S. at 26–27, 104 S.Ct. at 1565–66. Therefore, the exclusive contract between St. Joseph and ASA is not per se illegal under the *Jefferson Parish* analysis.

In light of the above conclusions, Defendants are entitled to summary judgment on Plaintiff's federal and state tying arrangement claims.

## II. *MONOPOLIZATION CLAIMS.*

Defendants next move for summary judgment on Plaintiff's monopolization claims which are contained in Counts I and III of the complaint. The complaint alleges that Defendants have monopolized and have attempted to monopolize with the intent to exclude or inhibit competition by Plaintiff. Complaint, ¶ 38. Section 2 of the Sherman Act "addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize." *Spectrum Sports, Inc. v. McQuillan,* —— U.S. ——, ——, 113 S.Ct. 884, 889, 122 L.Ed.2d 247 (1993).

■ To prove monopolization, Plaintiff must show that Defendants had "possession of monopoly power in the relevant market" and "the willful acquisition or maintenance of that power as distinguished from growth or development as a consequence of a superior

---

5. For 1990, total discharges for St. Joseph medical-surgical, obstetrics, and pediatrics were 14,700. Among the four non-federal hospitals, this represents a 21.4 percent market share. Total outpatient surgeries for 1990 were 9,263, representing a 26.9 percent market share for the non-

federal hospitals. Adding the raw numbers together results in a total of 23,963 patients in need of hospital services which require anesthesiology. St. Joseph's figures for actual cases where anesthesiology was administered is 22,480.

product, business acumen, or historic accident." *City of Chanute, Kan. v. Williams Natural Gas Co.,* 955 F.2d 641, 653–54 (10th Cir.1992) (*quoting United States v. Grinnell Corp.,* 384 U.S. 563, 570–71, 86 S.Ct. 1698, 1704, 16 L.Ed.2d 778 (1966)). In this context, Plaintiff has the burden of proving the "relevant market."

■ In defining the scope of the relevant market, both the product market and the geographic market must be considered. *City of Chanute,* 955 F.2d at 654; *Rural Tel. Serv. v. Feist Publications,* 957 F.2d 765, 768 (10th Cir.1992).

In the complaint, under the paragraph heading entitled "Relevant Market," Plaintiff has alleged that: "The provision of anesthesiology services within the Albuquerque, New Mexico metropolitan area is the relevant market for antitrust purposes." Complaint, ¶ 13.

As is evident from the above allegation, Plaintiff originally characterized the product market to be "the provision of anesthesiology services," and the geographic market to be "the Albuquerque, New Mexico metropolitan area." Later in the complaint, however, Plaintiff alleges that Defendants have caused anticompetitive effects "in the market for anesthesia services at St. Joseph Hospital." Complaint, ¶ 63. This allegation similarly characterizes the product market as "anesthesia services" but appears to recharacterize and limit the geographic market to "St. Joseph Hospital."

Focusing specifically on the two different geographic markets alleged, Defendants moved for summary judgment. Defendants first contend that the more limited characterization of geographic market as a single hospital fails as a matter of law. Defendants also contend that even using Plaintiff's broader characterization of the geographic market as the Albuquerque metropolitan area, Defendants are still entitled to summary judgment because there is no genuine issue of material fact as to whether Defendants possessed monopoly power in that particular geographic market.

## A. *St. Joseph Hospital as Geographic Market.*

■ A review of the several cases which have addressed this issue indicates that it would be inappropriate to limit the geographic market to a single hospital. *Collins v. Associated Pathologists,* 676 F.Supp. 1388, 1404–05 (C.D.Ill.1987); *Dos Santos v. Columbus–Cuneo–Cabrini Medical Ctr.,* 684 F.2d 1346, 1353 (7th Cir.1982); *Drs. Steuer and Latham v. National Medical Enters.,* 672 F.Supp. 1489, 1514 (D.S.C.1987).

In his response to the motion for summary judgment, Plaintiff denies that he seeks to limit the geographic market to one hospital. Instead, Plaintiff claims to reaffirm his position that the relevant geographic market is the Albuquerque metropolitan area, excluding the VA Hospital, Kirtland Air Force Base Hospital, and the Indian Health Service hospitals. Plaintiff's Memorandum on Monopolization Claim, ¶¶ 13, 14. It being undisputed that the relevant geographic market is the Albuquerque metropolitan area, the Court need not address the issue of a single hospital geographic market.

## B. *Metropolitan Albuquerque as Geographic Market.*

Defendants' second contention is that there is no genuine issue of material fact as to whether Defendants possess sufficient market power in the Albuquerque metropolitan area to support a monopolization claim. Defendants base this argument on Plaintiff's own characterization of product market, specifically alleged in the complaint, as the "provision of anesthesia services." Seeking to avoid summary judgment, Plaintiff responds by stating that "the relevant product market in this case is 'osteopathic' anesthesia services—that is, anesthesiology services provided by an osteopathically trained physician in a hospital which traditionally draws patients from osteopathic physicians." Plaintiff's Memorandum on Monopolization, ¶ 11.

Plaintiff's recharacterization of product market appears to be a departure from the allegation contained in paragraph 13 of the complaint and is an apparent attempt to exclude allopathic anesthesiology services from the relevant product market. This conten-

tion is raised by Plaintiff without moving to amend the complaint to narrow the relevant product market from anesthesiology services to osteopathic anesthesiology services.

In light of the above, the following two analyses must be made: first, can Plaintiff resist the motion for summary judgment using the relevant product market asserted in his complaint; and, second, if permitted to amend the complaint, can Plaintiff defeat summary judgment using the relevant product market asserted in his memorandum in opposition to the motion?

As to the first inquiry, the relevant market is the provision of anesthesia services in the Albuquerque metropolitan area. Defendants have asserted that in this relevant market, they have never possessed more than 23 percent of that market. As discussed in the section on tying arrangements, the Court concludes that Defendants have put forth sufficient evidence showing that they have not controlled more than 23 percent to 25 percent of the relevant market. Under the case law, this percentage is not, as a matter of law, sufficient to establish monopolization. *Pennsylvania Dental Ass'n. v. Medical Serv. Ass'n. of Pa.,* 745 F.2d 248, 261 (3d Cir.1984) (32 to 35 percent share of market is insufficient as a matter of law to establish monopolization); *United Air Lines, Inc. v. Austin Travel Corp.,* 867 F.2d 737, 742 (2d Cir.1989) (31 percent market share is insufficient); *United States v. Aluminum Co. of America,* 148 F.2d 416, 424 (2d Cir.1945) (33 percent of relevant market is "certainly" not a monopoly). Defendants have met their initial Rule 56 burden of showing that no genuine issue of material fact exists on this issue. It is now for Plaintiff to come forward with evidence to show that Defendants do possess a sufficient portion of the relevant market (in this instance the market defined in paragraph 13 of the complaint) to establish a question of fact as to whether Defendants had monopolized the market.

Again, Plaintiff has not disputed the contention that "market share for anesthesiology services can best be measured by hospital discharges in the areas of hospital services most related to surgical procedures." Using this measurement, the Court has concluded

that Defendants' evidence shows no more than a 23 percent to 25 percent market share for anesthesiology services in the Albuquerque metropolitan area.

In an attempt to controvert such evidence, and to show that Defendants possess a greater market share, Plaintiff refers to evidence concerning numbers of "operational hospital beds" and to statistics concerning hospital-based osteopathic anesthesiology services. This evidence is not material to the issue at hand. With respect to the issue of Defendants' market share as calculated by hospital discharges, Plaintiff merely repeats that "the jury could find that St. Joseph's market was well in excess of 23 percent." Plaintiff's Memorandum on Monopolization at 22.

Market share may indicate Defendants' market power and it may also indicate a lack of market power. Plaintiff has made no showing, has offered no evidence, as to what share of the relevant market Defendants possess. Of equal importance, is the fact that Plaintiff has made no showing of Defendants' power or ability to control prices or to exclude competition in the relevant market. *United States v. E.I. du Pont de Nemours & Co.,* 351 U.S. 377, 391–92, 76 S.Ct. 994, 1005, 100 L.Ed. 1264 (1956). Plaintiff has simply failed to show that there exists a genuine issue of material fact as to Defendants' monopoly power or market power in the market for anesthesiology services.

Based upon the definition of relevant market as put forth by Plaintiff in paragraph 13 of the complaint, Defendants are entitled to summary judgment on the claim of monopolization.

The Court's next inquiry addresses whether Plaintiff may withstand a motion for summary judgment based upon the narrow definition of the relevant product market as presented in Plaintiff's brief in opposition to the motion for summary judgment—that is, hospital-based osteopathic anesthesiology. In determining whether the relevant product market may be narrowed as contended by Plaintiff, it is necessary to examine the competing services and service providers. A rel-

evant product market is "composed of products that have reasonable interchangeability for the purposes for which they are produced—price, use, and qualities considered." *United States v. E.I. du Pont de Nemours & Co.*, 351 U.S. 377, 404, 76 S.Ct. 994, 1012, 100 L.Ed. 1264 (1956). A product market is defined to include interchangeable products or services. *Telex Corp. v. IBM Corp.*, 510 F.2d 894, 917–919 (10th Cir.1975). The interchangeability between substitutes is measured by a consumer's disposition to substitute a product in response to a price change.

An argument similar to that made by Plaintiff regarding product market was made in *Morgan, Strand, Wheeler & Biggs v. Radiology Ltd.*, 924 F.2d 1484 (9th Cir.1991), in which the court affirmed a summary judgment against the plaintiffs for failure to establish a relevant product market. In that case, the plaintiffs were asserting that the services of osteopathic radiologists were distinct from the market for radiology services generally. The same services are provided by osteopathic or allopathic practitioners. Despite their different training and standards for admission to practice, they satisfy the same consumer needs and therefore, operate in the same product market and are competitors. *Wilk v. American Medical Assn.*, 671 F.Supp. 1465 (N.D.Ill.1987), *aff'd*, 895 F.2d 352 (7th Cir.1990), *cert. denied*, 496 U.S. 927, 110 S.Ct. 2621, 110 L.Ed.2d 642 (1990); *see also Weiss v. York Hosp.*, 745 F.2d 786 (3d Cir.1984), *cert. denied*, 470 U.S. 1060, 105 S.Ct. 1777, 84 L.Ed.2d 836 (1985); *Oltz v. St. Peter's Community Hosp.*, 861 F.2d 1440, 1443 (9th Cir.1988); *Bhan v. NME Hosps., Inc.*, 929 F.2d 1404 (9th Cir. 1991).

■ The Court concludes that osteopathic anesthesia services and allopathic anesthesia services are reasonably interchangeable and, hence, part of the same relevant market. Therefore, Plaintiff has failed to sustain his position that the relevant product market

may be limited to hospital-based osteopathic anesthesiology.

■ Finally, and in any event, the court concludes that Plaintiff should not be permitted to amend his complaint to narrow his definition of the relevant product market. A motion to amend may properly be denied when there has been undue delay in moving for leave to amend or when amendment would be futile. *Foman v. Davis*, 371 U.S. 178, 182, 83 S.Ct. 227, 230, 9 L.Ed.2d 222 (1962); *In re Beef Indus. Antitrust Litig.*, 600 F.2d 1148, 1162 (5th Cir.1979), *cert. denied*, 449 U.S. 905, 101 S.Ct. 280, 66 L.Ed.2d 137 (1980). Defendant's Motion for Partial Summary Judgment Dismissing Plaintiff's Monopolization Claim was filed on February 18, 1992. The suit was filed on March 13, 1990. The plaintiff has had ample time to seek to amend his complaint, but has failed to do so during the more than two years since he filed his brief in opposition. Moreover, in light of the Court's analysis above, it would be futile to seek to do so because such a narrow characterization of the product market is not supported by the evidence or the law. Defendants are entitled to summary judgment on Plaintiff's monopolization claims.[6]

## III. *GROUP BOYCOTT CLAIMS.*

Finally, Defendants have moved for summary judgment on Plaintiff's group boycott claims. These claims are contained in Counts II and III of the Complaint. It is Plaintiff's contention that Defendants engaged in a collective or group boycott in that they combined to exclude him from the practice of anesthesiology. In their motion for summary judgment, Defendants raise three arguments: (i) that Plaintiff's claim fails because there is no evidence of concerted activity between two or more of his competitors whose market positions are horizontal to each other; (ii) that there is no evidence of per se liability; and, (iii) that there is no

---

6. Both the monopolization and attempt to monopolize claims are disposed of. As is made clear by the Supreme Court's decision in *Spectrum Sports, Inc. v. McQuillan*, —— U.S. ——, 113 S.Ct. 884, 122 L.Ed.2d 247 (1993), both claims require an adequate showing of relevant market. As stated in *Spectrum Sports*, "demonstrating the

dangerous probability of monopolization in an attempt case ... requires inquiry into the relevant product and geographic market and the defendant's economic power in that market." *Id.* at ——, 113 S.Ct. at 892. Because no such showing has been made by Plaintiff, summary judgment is appropriate on both claims.

evidence which would support liability under the rule of reason. For the reasons stated below, Defendants are entitled to summary judgment on the group boycott claims.

Plaintiff's group boycott claim alleges that, "Defendants Dr. Renger, ASA and St. Joseph have contracted, combined and conspired with others in an unreasonable restraint of trade or commerce." Complaint, ¶ 43. The essence of Plaintiff's theory is that Defendants conspired to exclude him from performing his services in the market because of their animosity toward osteopathic physicians and because they wanted to limit the competition for ASA.

Specifically, Plaintiff contends that St. Joseph's denial of staff privileges took place in the context of allopathic bias against osteopathic practitioners. Plaintiff's Memorandum on Group Boycott at 22. Plaintiff states that the allopathic physicians involved in the decision making were suspicious of and held prejudices and animosity toward the osteopaths at Heights. *Id.* at 23. Plaintiff states that in particular, Renger was biased against osteopaths and Leyba and that Renger was "intimately involved" in the denial of privileges. *Id.* at 22.

### A. *Horizontal Restraint.*

"A concerted, horizontal refusal to deal—which is often referred to as a group boycott—is an agreement among competitors not to deal with a third party or parties." Von Kalinowski, *Antitrust Laws and Trade Regulation,* Vol. 2, § 6D.01. "To prove that a conspiracy exists which violates Section 1 of the Sherman Act, [Leyba] must show either that the conspiracy results in an unreasonable restraint on competition (referred to as the rule of reason), or that the conduct falls into one of the categories of 'per se' illegality." *Coffey v. Healthtrust, Inc.,* 955 F.2d 1388, 1392 (10th Cir.1992) (*citing Northwest Wholesale Stationers, Inc. v. Pacific Stationery and Printing Co.,* 472 U.S. 284,

289, 105 S.Ct. 2613, 2616–17, 86 L.Ed.2d 202 (1985)).

■ For the plaintiff to establish that a group boycott is per se illegal, he must prove the existence of an agreement among conspirators whose market positions are horizontal to each other. *Coffey,* 955 F.2d at 1392 (*citing Westman Comm'n. Co. v. Hobart Int'l, Inc.,* 796 F.2d 1216, 1224, n. 1 (10th Cir.1986); *Key Fin. Planning Corp. v. ITT Life Ins. Corp.,* 828 F.2d 635, 641 (10th Cir. 1987)). The offending competitors need not be at the same market level as the plaintiff, but Plaintiff must show concerted activity between two or more competitors which are positioned at the same market level with each other. *Key,* 828 F.2d at 641. Defendants contend that there is no genuine issue of material fact as to whether they as a group are horizontal competitors, and as to whether there is evidence of concerted activity.

■ To controvert these claims, Plaintiff argues that "there is substantial evidence in this record of a horizontal combination or conspiracy." Plaintiff's Memorandum on Group Boycott at 15. Again, Plaintiff must show both a horizontal relationship and a conspiracy. In support of Plaintiff's contentions, Plaintiff states that "the initial denial of staff privileges resulted from the actions of the physicians on the medical staff of the St. Joseph hospitals." *Id.* at 21. Plaintiff cites to the fact that "Dr. Renger, on behalf of ASA, was intimately involved in [Leyba's] denial of privileges through the medical staff credentialing process." *Id.* at 22. Moreover, he cites to "numerous contacts" between Renger and other allopathic physicians which would warrant a jury finding that Renger had combined and conspired with others to prevent Plaintiff from obtaining anesthesiology privileges at the St. Joseph hospitals. *Id.*[7]

---

**7.** The specific facts cited to by Leyba in an effort to defeat summary judgment are as follows: "Members of the St. Joseph administration, including Kirk and Dr. Floyd, had numerous meetings and other communications with Dr. Renger and other ASA anesthesiologists about dealing with the D.O. anesthesiologists practicing at Heights General. There were numerous communications among Mr. Kirk, Dr. Duncan, and Dr. Renger concerning Dr. Leyba's participation in the ASA group. The St. Joseph administration had numerous meetings and communications with members of its medical staff concerning the Heights General acquisition and how to deal

Of critical importance, however, is the fact that Plaintiff has put forth absolutely no direct evidence of an agreement between Renger, ASA, St. Joseph or staff physicians to exclude Plaintiff from the market, or to deny him staff privileges. Moreover, there is insubstantial circumstantial evidence put forth on the issue of conspiracy. The evidence Plaintiff does put forth is ambiguous and is consistent with legitimate activities.

As stated in *Key,*

In an antitrust action based on section one of the Sherman Act ... ambiguous evidence, standing alone, is not enough to survive a defendant's motion for summary judgment. 'Antitrust law limits the range of permissible inferences from ambiguous evidence in a § 1 case' ... To survive a motion for summary judgment ... [a plaintiff] must present evidence 'that tends to exclude the possibility' that the alleged conspirators acted independently.'

[I]f the evidence is as consistent with permissible independent business interests as with an illegal conspiracy, then the plaintiff fails to create a fact issue on the existence of a section one conspiracy *unless* the ambiguity is negated by evidence tending to exclude the possibility that the defendants were pursuing independent interests.

*Key,* 828 F.2d 635, 638–9 (citations omitted).

The Court concludes that there is just no evidence of a Section 1 conspiracy. As pointed out in the opinion on defamation, at minimum, there is evidence of independent action by one anesthesiologist, but no evidence of agreement or concerted action by the defendants herein.

Moreover, Plaintiff has failed to put forth sufficient evidence to show that the relationship between Dr. Renger, ASA, St. Joseph and the alleged "other physicians" is horizontal. Dr. Renger and ASA are not in competition with each other, and neither Renger nor ASA are in competition with St. Joseph for the provision of anesthesiology services. In light of the above, I conclude that Defendants are entitled to summary judgment on the claim of horizontal restraint of trade.

**B. *Vertical Restraint.***

 The evidence shows that St. Joseph is not at the same market level as either Dr. Renger or ASA, and is not in competition with either of these parties for the provision of anesthesiology services. Hence, their relationship is not horizontal. If anything, the evidence shows that the relationship between the defendants is vertical. *See Coffey,* 955 F.2d 1388 (10th Cir.1992). A vertical restraint on trade is said to occur "when persons or firms at different market levels in the chain of distribution of a specific product conspire to restrain trade." *Key,* 828 F.2d at 640, n. 3; *Business Elecs. Corp. v. Sharp Elecs. Corp.,* 485 U.S. 717, 730, 108 S.Ct. 1515, 1522–23, 99 L.Ed.2d 808 (1988). It is not clear from the case law whether the vertical restraint concept would be directly applicable in this situation, in light of the fact that this is not a classic "product distribution" case. But even applying this concept, I find no antitrust violation under either the per se rule or the rule of reason analysis.

 Applying first the "per se" rule, the Court notes that it is only appropriate when it relates to conduct that is manifestly anticompetitive. *Key,* 828 F.2d at 640 (*quoting Continental T.V., Inc. v. GTE Sylvania, Inc.,* 433 U.S. 36, 49–50, 97 S.Ct. 2549, 2557, 53 L.Ed.2d 568 (1977)). The Tenth Circuit only applies a per se rule to vertical restraints of trade if they include price fixing motives. *Id.* at 640 (*citing Westman,* 796 F.2d 1216, 1222–24 (10th Cir.1986)). Here, as in *Key,* there are no allegations, nor is there any hint of evidence, that price fixing has occurred. Hence, there is no per se illegality.

With regard to the second inquiry, "[i]n order to satisfy the rule of reason, the plaintiff must prove that [his denial of staff privileges] had an adverse impact on competition." *Key,* at 642. That is, the plaintiff must show that the complained of activity unreasonably restrained competition among anesthesiologists within the relevant geographic market.

---

with the heavily osteopathic medical staff already credentialed there." Plaintiff's Counterstate-

ment of Material Facts, ¶ 12; Memorandum on Group Boycott.

The relevant geographic market is that set out in paragraph 13 of the complaint: the Albuquerque metropolitan area, and the relevant product market is the provision of anesthesiology services.[8] Defendants contend that there is no issue of material fact with regard to whether there has been an adverse effect upon competition among anesthesiologists in the relevant geographic market. Specifically, Defendants assert an absence of evidence regarding the effect on the price, the quality, or the supply or demand for anesthesiology services.

In response, Plaintiff offers no evidence concerning effect upon the price or quality of anesthesiology services. Instead, Plaintiff offers evidence which he claims shows that the supply of anesthesiology services has been adversely affected. In support of this contention, Plaintiff cites to the fact that three individual osteopathic anesthesiologists were impacted by St. Joseph's takeover of the Heights hospital. First, Plaintiff cites to the fact that Dr. Langford reached an agreement with Defendants whereby he agreed that he would not practice in the Albuquerque area after ninety days. Dr. Langford eventually moved away from New Mexico. Second, Plaintiff cites to Dr. Margel, who was concerned that the takeover would make it impossible for him to continue his practice in Albuquerque. But Plaintiff himself acknowledges that Dr. Margel was granted staff privileges at St. Joseph and became associated with ASA. Hence, there was an osteopathic anesthesiologist offering his services at St. Joseph. Finally, Plaintiff cites to his own situation of being denied staff privileges in support of his contention that the supply of anesthesiologists in the Albuquerque market was adversely impacted.

Plaintiff's evidence, that two osteopathic anesthesiologists left the Albuquerque market, without more, is insufficient to defeat summary judgment. Plaintiff failed to set forth sufficient evidence regarding the impact upon consumers, if any, by the loss of the osteopathic anesthesiologists. A close look at the evidence offered by Plaintiff makes clear that the true nature of the "impact" upon the competition is the direct harm suffered by Dr. Leyba. As in *Coffey*, Plaintiff has simply shown that *he* suffered a detrimental effect, not that the competition in general was adversely impacted and not that there was a negative impact upon consumers.

Finally, Defendants assert a lack of evidence of market power on the part of Defendants and, hence, argue that there is no anticompetitive effect under the rule of reason. As noted in the Court's opinion on monopolization and on tying arrangements, I agree that Defendants did not, as a matter of law, possess sufficient market power to warrant liability under the rule of reason. Again, the relevant geographic and product market is the provision of anesthesiology services in the Albuquerque metropolitan area. (The product market is not limited to osteopathic anesthesiology services.) Looking at that market, there is no suggestion that there has been a negative impact upon price, quality, or the supply or demand for anesthesiology services generally. But even if you only looked at osteopathic anesthesiology services as the product market, there is insufficient evidence to defeat summary judgment that competition was negatively impacted. For all of the above reasons, Defendants are entitled to summary judgment on the group boycott claim.

An order in accordance with this memorandum opinion shall be entered.

### *ORDER*

**THIS MATTER** is before the Court on Defendants' Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Tying Arrangement Claim (Docket No. 171); Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Monopolization Claim (Docket No. 173); and Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Group Boycott Claim (Docket No. 177), filed on February 18, 1992. Having thoroughly considered the submissions of the parties and the applicable law in the matter, and having contemporaneously issued its memorandum opinion herewith, the Court

8. As noted earlier, Plaintiff does not assert a relevant geographic market of a single hospital.

finds that Defendants' motions are well taken and should be granted.

**IT IS, THEREFORE, ORDERED** that Defendants' Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Tying Arrangement Claim, Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Monopolization Claim, and Joint Motion for Partial Summary Judgment Dismissing Plaintiff's Group Boycott Claim are hereby **granted.** Partial summary judgment on Plaintiff's tying arrangement, monopolization, and group boycott claims is hereby entered in favor of Defendants and against Plaintiff.