SPECTRUM SPORTS, INC., ET AL. *v.* McQUILLAN
ET VIR, DBA SORBOTURF ENTERPRISES

No. 91–10.   Argued November 10, 1992—Decided January 25, 1993

WHITE, J., delivered the opinion for a unanimous Court.

*James D. Vail* argued the cause and filed briefs for petitioners.

*Robert A. Long, Jr.,* argued the cause for the United States as *amicus curiae* in support of petitioners. With him on the brief were *Solicitor General Starr, Acting Assistant Attorney General James, Deputy Solicitor General Wallace,* and *Catherine G. O'Sullivan.*

*Jeffrey M. Shohet* argued the cause for respondents. With him on the brief was *Marcelle E. Mihaila.*

JUSTICE WHITE delivered the opinion of the Court.

Section 2 of the Sherman Act, 26 Stat. 209, as amended, 15 U. S. C. § 2, makes it an offense for any person to "monopolize, or attempt to monopolize, or combine or conspire with any other person or persons, to monopolize any part of the trade or commerce among the several States . . . ." The jury in this case returned a verdict finding that petitioners had monopolized, attempted to monopolize, and/or conspired to monopolize. The District Court entered a judgment rul-

ing that petitioners had violated § 2, and the Court of Appeals affirmed on the ground that petitioners had attempted to monopolize. The issue we have before us is whether the District Court and the Court of Appeals correctly defined the elements of that offense.

## I

Sorbothane is a patented elastic polymer whose shock-absorbing characteristics make it useful in a variety of medical, athletic, and equestrian products. BTR, Inc. (BTR), owns the patent rights to sorbothane, and its wholly owned subsidiaries manufacture the product in the United States and Britain. Hamilton-Kent Manufacturing Company (Hamilton-Kent) and Sorbothane, Inc. (S. I.), were at all relevant times owned by BTR. S. I. was formed in 1982 to take over Hamilton-Kent's sorbothane business.[1] App. to Pet. for Cert. A3. Respondents Shirley and Larry McQuillan, doing business as Sorboturf Enterprises, were regional distributors of sorbothane products from 1981 to 1983. Petitioner Spectrum Sports, Inc. (Spectrum), was also a distributor of sorbothane products. Petitioner Kenneth B. Leighton, Jr., is a co-owner of Spectrum. *Ibid.* Kenneth Leighton, Jr., is the son of Kenneth Leighton, Sr., the president of Hamilton-Kent and S. I. at all relevant times.

In 1980, respondents Shirley and Larry McQuillan signed a letter of intent with Hamilton-Kent, which then owned all manufacturing and distribution rights to sorbothane. The letter of intent granted the McQuillans exclusive rights to purchase sorbothane for use in equestrian products. Respondents were designing a horseshoe pad using sorbothane.

In 1981, Hamilton-Kent decided to establish five regional distributorships for sorbothane. Respondents were selected to be distributors of all sorbothane products, including medical products and shoe inserts, in the Southwest. Spectrum

---

[1] Sorbothane, Inc., was formerly called Sorbo, Inc. App. 67.

was selected as distributor for another region. *Id.*, at A4–A5.

In January 1982, Hamilton-Kent shifted responsibility for selling medical products from five regional distributors to a single national distributor. In April 1982, Hamilton-Kent told respondents that it wanted them to relinquish their athletic shoe distributorship as a condition for retaining the right to develop and distribute equestrian products. As of May 1982, BTR had moved the sorbothane business from Hamilton-Kent to S. I. *Id.*, at A6. In May, the marketing manager of S. I. again made clear that respondents had to sell their athletic distributorship to keep their equestrian distribution rights. At a meeting scheduled to discuss the sale of respondents' athletic distributorship to petitioner Leighton, Jr., Leighton, Jr., informed Shirley McQuillan that if she did not come to agreement with him she would be "'looking for work.'" *Id.*, at A6. Respondents refused to sell and continued to distribute athletic shoe inserts.

In the fall of 1982, Leighton, Sr., informed respondents that another concern had been appointed as the national equestrian distributor, and that they were "no longer involved in equestrian products." *Id.*, at A7. In January 1983, S. I. began marketing through a national distributor a sorbothane horseshoe pad allegedly indistinguishable from the one designed by respondents. *Ibid.* In August 1983, S. I. informed respondents that it would no longer accept their orders. *Ibid.* Spectrum thereupon became national distributor of sorbothane athletic shoe inserts. Pet. for Cert. 6. Respondents sought to obtain sorbothane from the BTR's British subsidiary, but were informed by that subsidiary that it would not sell sorbothane in the United States. Respondents' business failed. App. to Pet. for Cert. A8.

Respondents sued petitioners seeking damages for alleged violations of §§ 1 and 2 of the Sherman Act, 15 U. S. C. §§ 1

and 2,[2] § 3 of the Clayton Act, 38 Stat. 731, 15 U. S. C. § 14, the Racketeer Influenced and Corrupt Organizations Act (RICO), 18 U. S. C. § 1962, and two provisions of California business law. Respondents also alleged fraud, breach of oral contract, interference with prospective business advantage, bad-faith denial of the existence of an oral contract, and conversion.

The case was tried to a jury, which returned a verdict against one or more of the defendants on each of the 11 alleged violations on which it was to return a verdict. All of the defendants were found to have violated § 2 by, in the words of the verdict sheet, "monopolizing, attempting to monopolize, and/or conspiring to monopolize." App. 410. Petitioners were also found to have violated civil RICO and the California unfair practices law, but not § 1 of the Sherman Act. The jury awarded $1,743,000 in compensatory damages on each of the violations found to have occurred.[3] This amount was trebled under § 4 of the Clayton Act. The District Court also awarded nearly $1 million in attorney's fees and denied motions for judgment notwithstanding the verdict and for a new trial.

---

[2] Two violations of § 1 were alleged, resale price maintenance and division of territories. Attempted monopolization, monopolization, and conspiracy to monopolize were charged under § 2. All in all, four alleged violations of federal law and seven alleged violations of state law were sent to the jury.

[3] The special verdict form advised the jury as follows:

"The following pages identify the name of each defendant and the claims for which plaintiffs contend that the defendant is liable. If you find that any of the defendants are liable on any of the claims, you may award damages to the plaintiffs against those defendants. Should you decide to award damages, please assess damages for *each* defendant and *each* claim separately and without regard to whether you have already awarded the same damages on another claim or against another defendant. The court will insure that there is no double recovery. The verdict will *not* be totaled." App. 416.

The Court of Appeals for the Ninth Circuit affirmed the judgment in an unpublished opinion. Judgt. order reported at 907 F. 2d 154 (1990). The court expressly ruled that the trial court had properly instructed the jury on the Sherman Act claims and found that the evidence supported the liability verdicts as well as the damages awards on these claims. The court then affirmed the judgment of the District Court, finding it unnecessary to rule on challenges to other violations found by the jury. App. to Pet. for Cert. A28. On the § 2 issue that petitioners present here, the Court of Appeals, noting that the jury had found that petitioners had violated § 2 without specifying whether they had monopolized, attempted to monopolize, or conspired to monopolize, held that the verdict would stand if the evidence supported any one of the three possible violations of § 2. *Id.*, at A15. The court went on to conclude that a case of attempted monopolization had been established.[4] The court rejected petitioners' argument that attempted monopolization had not been established because respondents had failed to prove that petitioners had a specific intent to monopolize a relevant market. The court also held that in order to show that respondents'

---

[4] The District Court's jury instructions were transcribed as follows:

"In order to win on the claim of attempted monopoly, the Plaintiff must prove each of the following elements by a preponderance of the evidence: first, that the Defendants had a specific intent to achieve monopoly power in the relevant market; second, that the Defendants engaged in exclusionary or restrictive conduct in furtherance of its specific intent; third, that there was a dangerous probability that Defendants could sooner or later achieve [their] goal of monopoly power in the relevant market; fourth, that the Defendants' conduct occurred in or affected interstate commerce; and, fifth, that the Plaintiff was injured in the business or property by the Defendants' exclusionary or restrictive conduct.

.        .        .        .        .

"If the Plaintiff has shown that the Defendant engaged in predatory conduct, you may infer from that evidence the specific intent and the dangerous probability element of the offense without any proof of the relevant market or the Defendants' marketing *[sic]* power." *Id.*, at 251–252. See also App. to Pet. for Cert. A16, A20.

attempt to monopolize was likely to succeed it was not necessary to present evidence of the relevant market or of the defendants' market power. In so doing, the Ninth Circuit relied on *Lessig* v. *Tidewater Oil Co.*, 327 F. 2d 459 (CA9), cert. denied, 377 U. S. 993 (1964), and its progeny. App. to Pet. for Cert. A18–A19. The Court of Appeals noted that these cases, in dealing with attempt to monopolize claims, had ruled that "if evidence of unfair or predatory conduct is presented, it may satisfy both the specific intent and dangerous probability elements of the offense, without any proof of relevant market or the defendant's marketpower *[sic]*." *Id.,* at A19. If, however, there is insufficient evidence of unfair or predatory conduct, there must be a showing of "relevant market or the defendant's marketpower *[sic]*." *Ibid.* The court went on to find:

> "There is sufficient evidence from which the jury could conclude that the S. I. Group and Spectrum Group engaged in unfair or predatory conduct and thus inferred that they had the specific intent and the dangerous probability of success and, therefore, McQuillan did not have to prove relevant market or the defendant's marketing power." *Id.,* at A21.

The decision below, and the *Lessig* line of decisions on which it relies, conflicts with holdings of courts in other Circuits. Every other Court of Appeals has indicated that proving an attempt to monopolize requires proof of a dangerous probability of monopolization of a relevant market.[5] We

---

[5] See, *e. g., CVD, Inc.* v. *Raytheon Co.,* 769 F. 2d 842, 851 (CA1 1985), cert. denied, 475 U. S. 1016 (1986); *Twin Laboratories, Inc.* v. *Weider Health & Fitness,* 900 F. 2d 566, 570 (CA2 1990); *Harold Friedman, Inc.* v. *Kroger Co.,* 581 F. 2d 1068, 1079 (CA3 1978); *Abcor Corp.* v. *AM Int'l, Inc.,* 916 F. 2d 924, 926, 931 (CA4 1990); *C. A. T. Industrial Disposal, Inc.* v. *Browning-Ferris Industries, Inc.,* 884 F. 2d 209, 210 (CA5 1989); *Arthur S. Langenderfer, Inc.* v. *S. E. Johnson Co.,* 917 F. 2d 1413, 1431–1432 (CA6 1990), cert. denied, 502 U. S. 899 (1991); *Indiana Grocery, Inc.* v. *Super Valu Stores, Inc.,* 864 F. 2d 1409, 1413–1416 (CA7 1989); *General Indus-*

granted certiorari, 503 U. S. 958 (1992), to resolve this conflict among the Circuits.[6]   We reverse.

## II

While § 1 of the Sherman Act forbids contracts or conspiracies in restraint of trade or commerce, § 2 addresses the actions of single firms that monopolize or attempt to monopolize, as well as conspiracies and combinations to monopolize. Section 2 does not define the elements of the offense of attempted monopolization.   Nor is there much guidance to be had in the scant legislative history of that provision, which was added late in the legislative process.   See 1 E. Kintner, Legislative History of the Federal Antitrust Laws and Related Statutes 23–25 (1978); 3 P. Areeda & D. Turner, Antitrust Law ¶ 617, pp. 39–41 (1978).   The legislative history does indicate that much of the interpretation of the necessarily broad principles of the Act was to be left for the courts in particular cases.   See, *e. g.*, 21 Cong. Rec. 2460 (1890) (statement of Sen. Sherman).   See also 1 Kintner, *supra*, at 19; 3 Areeda & Turner, *supra*, ¶ 617, at 40.

This Court first addressed the meaning of attempt to monopolize under § 2 in *Swift & Co.* v. *United States,* 196 U. S. 375 (1905).   The Court's opinion, written by Justice Holmes, contained the following passage:

---

*tries Corp.* v. *Hartz Mountain Corp.,* 810 F. 2d 795, 804 (CA8 1987); *Colorado Interstate Gas Co.* v. *Natural Gas Pipeline Co. of America,* 885 F. 2d 683, 693 (CA10 1989), cert. denied, 498 U. S. 972 (1990); *Key Enterprises of Delaware, Inc.* v. *Venice Hospital,* 919 F. 2d 1550, 1565 (CA11 1990); *Neumann* v. *Reinforced Earth Co.,* 252 U. S. App. D. C. 11, 15–16, 786 F. 2d 424, 428–429, cert. denied, 479 U. S. 851 (1986); *Abbott Laboratories* v. *Brennan,* 952 F. 2d 1346, 1354 (CA Fed. 1991), cert. denied, 505 U. S. 1205 (1992).

[6] Our grant of certiorari was limited to the first question presented in the petition: "Whether a manufacturer's distributor expressly absolved of violating Section 1 of the Sherman Act can, without any evidence of market power or specific intent, be found liable for attempting to monopolize solely by virtue of a unique Ninth Circuit rule?"   Pet. for Cert. i.

"Where acts are not sufficient in themselves to produce a result which the law seeks to prevent—for instance, the monopoly—but require further acts in addition to the mere forces of nature to bring that result to pass, an intent to bring it to pass is necessary in order to produce a dangerous probability that it will happen. *Commonwealth* v. *Peaslee*, 177 Massachusetts 267, 272 [59 N. E. 55, 56 (1901)]. But when that intent and the consequent dangerous probability exist, this statute, like many others and like the common law in some cases, directs itself against that dangerous probability as well as against the completed result." *Id.*, at 396.

The Court went on to explain, however, that not every act done with intent to produce an unlawful result constitutes an attempt. "It is a question of proximity and degree." *Id.*, at 402. *Swift* thus indicated that intent is necessary, but alone is not sufficient, to establish the dangerous probability of success that is the object of § 2's prohibition of attempts.[7]

The Court's decisions since *Swift* have reflected the view that the plaintiff charging attempted monopolization must prove a dangerous probability of actual monopolization, which has generally required a definition of the relevant market and examination of market power. In *Walker Process Equipment, Inc.* v. *Food Machinery & Chemical Corp.*, 382 U. S. 172, 177 (1965), we found that enforcement of a fraudulently obtained patent claim could violate the Sherman Act. We stated that, to establish monopolization or attempt to monopolize under § 2 of the Sherman Act, it would

---

[7]Justice Holmes confirmed that this was his interpretation of *Swift* in *Hyde* v. *United States*, 225 U. S. 347 (1912). In dissenting in that case on other grounds, the Justice, citing *Swift*, stated that an attempt may be found where the danger of harm is very great; however, "combination, intention and overt act may all be present without amounting to a criminal attempt .... There must be dangerous proximity to success." 225 U. S., at 387–388.

be necessary to appraise the exclusionary power of the illegal patent claim in terms of the relevant market for the product involved. *Ibid.* The reason was that "[w]ithout a definition of that market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Ibid.*

Similarly, this Court reaffirmed in *Copperweld Corp.* v. *Independence Tube Corp.*, 467 U. S. 752 (1984), that "Congress authorized Sherman Act scrutiny of single firms only when they pose a danger of monopolization. Judging unilateral conduct in this manner reduces the risk that the antitrust laws will dampen the competitive zeal of a single aggressive entrepreneur." *Id.*, at 768. Thus, the conduct of a single firm, governed by §2, "is unlawful only when it threatens actual monopolization." *Id.*, at 767. See also *Lorain Journal Co.* v. *United States*, 342 U. S. 143, 154 (1951); *United States* v. *Griffith*, 334 U. S. 100, 105–106 (1948); *American Tobacco Co.* v. *United States*, 328 U. S. 781, 785 (1946).

The Courts of Appeals other than the Ninth Circuit have followed this approach. Consistent with our cases, it is generally required that to demonstrate attempted monopolization a plaintiff must prove (1) that the defendant has engaged in predatory or anticompetitive conduct with (2) a specific intent to monopolize and (3) a dangerous probability of achieving monopoly power. See 3 Areeda & Turner, *supra*, ¶ 820, at 312. In order to determine whether there is a dangerous probability of monopolization, courts have found it necessary to consider the relevant market and the defendant's ability to lessen or destroy competition in that market.[8]

---

[8] See, *e. g., Arthur S. Langenderfer, Inc.* v. *S. E. Johnson Co.*, 917 F. 2d, at 1431–1432; *Twin Laboratories, Inc.* v. *Weider Health & Fitness*, 900 F. 2d, at 570; *Colorado Interstate Gas Co.* v. *Natural Gas Pipeline Co. of America*, 885 F. 2d, at 693; *Indiana Grocery, Inc.* v. *Super Valu Stores, Inc.*, 864 F. 2d, at 1413–1416; *General Industries Corp.* v. *Hartz Mountain Corp.*, 810 F. 2d, at 804.

Notwithstanding the array of authority contrary to *Lessig*, the Court of Appeals in this case reaffirmed its prior holdings; indeed, it did not mention either this Court's decisions discussed above or the many decisions of other Courts of Appeals reaching contrary results. Respondents urge us to affirm the decision below. We are not at all inclined, however, to embrace *Lessig*'s interpretation of § 2, for there is little, if any, support for it in the statute or the case law, and the notion that proof of unfair or predatory conduct alone is sufficient to make out the offense of attempted monopolization is contrary to the purpose and policy of the Sherman Act.

The *Lessig* opinion claimed support from the language of § 2, which prohibits attempts to monopolize "any part" of commerce, and therefore forbids attempts to monopolize any appreciable segment of interstate sales of the relevant product. See *United States* v. *Yellow Cab Co.*, 332 U. S. 218, 226 (1947). The "any part" clause, however, applies to charges of monopolization as well as to attempts to monopolize, and it is beyond doubt that the former requires proof of market power in a relevant market. *United States* v. *Grinnell Corp.*, 384 U. S. 563, 570–571 (1966); *United States* v. *E. I. du Pont de Nemours & Co.*, 351 U. S. 377, 404 (1956).[9]

In support of its determination that an inference of dangerous probability was permissible from a showing of intent, the *Lessig* opinion cited, and added emphasis to, this Court's reference in its opinion in *Swift* to "'intent and the *consequent* dangerous probability.'" 327 F. 2d, at 474, n. 46, quoting 196 U. S., at 396. But any question whether dangerous

---

[9] *Lessig* cited *United States* v. *Yellow Cab Co.*, 332 U. S., at 226, in support of its interpretation, but *Yellow Cab* relied on the "any part" language to support the proposition that it is immaterial how large an amount of interstate trade is affected, or how important that part of commerce is in relation to the entire amount of that type of commerce in the Nation.

probability of success requires proof of more than intent alone should have been removed by the subsequent passage in *Swift* which stated that "not every act that may be done with intent to produce an unlawful result . . . constitutes an attempt. It is a question of proximity and degree." *Id.*, at 402.

The *Lessig* court also relied on a footnote in *Du Pont & Co., supra*, at 395, n. 23, for the proposition that when the charge is attempt to monopolize, the relevant market is "not in issue." That footnote, which appeared in analysis of the relevant market issue in *Du Pont*, rejected the Government's reliance on several cases, noting that "the scope of the market was not in issue" in *Story Parchment Co.* v. *Paterson Parchment Paper Co.*, 282 U. S. 555 (1931). That reference merely reflected the fact that, in *Story Parchment*, which was not an attempt to monopolize case, the parties did not challenge the definition of the market adopted by the lower courts. Nor was *Du Pont* itself concerned with the issue in this case.

It is also our view that *Lessig* and later Ninth Circuit decisions refining and applying it are inconsistent with the policy of the Sherman Act. The purpose of the Act is not to protect businesses from the working of the market; it is to protect the public from the failure of the market. The law directs itself not against conduct which is competitive, even severely so, but against conduct which unfairly tends to destroy competition itself. It does so not out of solicitude for private concerns but out of concern for the public interest. See, *e. g.*, *Brunswick Corp.* v. *Pueblo Bowl-O-Mat, Inc.*, 429 U. S. 477, 488 (1977); *Cargill, Inc.* v. *Monfort of Colorado, Inc.*, 479 U. S. 104, 116–117 (1986); *Brown Shoe Co.* v. *United States*, 370 U. S. 294, 320 (1962). Thus, this Court and other courts have been careful to avoid constructions of §2 which might chill competition, rather than foster it. It is some-