# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 05-1456

R.J. REYNOLDS TOBACCO COMPANY and GMB, INC.,

*Plaintiffs-Appellees*,

*v.*

CIGARETTES CHEAPER!,

*Defendant-Appellant.*

Appeal from the United States District Court for the
Northern District of Illinois, Eastern Division.
No. 99 C 1174—**Charles P. Kocoras**, *Judge*.

ARGUED SEPTEMBER 12, 2005—DECIDED AUGUST 24, 2006

Before COFFEY, EASTERBROOK, and EVANS, *Circuit Judges*.

EASTERBROOK, *Circuit Judge*. R.J. Reynolds sells cigarettes (Camel, Winston, Salem, and Doral are its principal brands) in both domestic and foreign commerce. For several years Cigarettes Cheaper!, which operates a chain of retail outlets, reimported Reynolds products for domestic sale. (We refer to the practice as "reimportation" even though some of the cigarettes in question were manufactured outside the United States by firms licensed to use the trademarks in their own countries.) That practice led to this litigation, which Reynolds commenced under the Lanham Act. GMB, one of Reynolds's subsidiaries, owns the marks

and is an additional party for that reason. To prevent needless repetition, for the rest of this opinion we treat Reynolds as the sole plaintiff.

Reynolds argued that the sale of gray market products violates the Lanham Act, 15 U.S.C. §§ 1050 to 1127, which protects trademarks used in interstate commerce. Cigarettes Cheaper! replied that the marks are genuine (after all, they were applied by Reynolds or under its license) and took the offensive with two antitrust counterclaims, one based on the Sherman Act and the other on the Robinson-Patman Act. 15 U.S.C. §13. The Sherman Act theory is that Reynolds conspired with retail dealers, in violation of 15 U.S.C. §§ 1 and 2, to drive it out of business; the Robinson-Patman theory is that Reynolds charged different prices to different retail dealers and in particular refused to sell cigarettes to Cigarettes Cheaper! at its lowest level of discounts (which is, Cigarettes Cheaper! maintains, why it searched abroad for cigarettes to reimport).

The three claims took separate paths. The district court granted summary judgment for Reynolds on the Sherman Act claim after concluding that Reynolds lacks market power. The Robinson-Patman Act claim went to trial, which lasted five weeks. A jury returned a general verdict in favor of Reynolds. Finally the trademark claim was tried to a different jury, after the district judge rejected Cigarettes Cheaper!'s argument that the Lanham Act always permits the use in the United States of trademarks affixed by their proprietor. If the products designed for domestic and foreign markets are materially different, then sale of the reimported product under a mark that consumers associate with the domestic product could be confusing and hence unlawful, the district court ruled. The trial to determine whether the domestic and foreign cigarettes are materially different lasted two weeks. The jury concluded that they are different and awarded Reynolds approximately $4 million in damages. Having lost on all three claims, Cigarettes Cheaper!

has appealed; it complains not only about the principal decisions but also about a large number of evidentiary and other procedural rulings that it says prevented the juries from approaching the issues correctly.

## I

As its name implies, Cigarettes Cheaper! is a discounter. That makes it unpopular with other retailers, which don't like competition—but, one would suppose, pleases manufacturers, whose sales increase as the costs of distribution falls. From a manufacturer's perspective, the cost of retail distribution is the difference between the wholesale price it realizes and what the ultimate customer pays. As this cost of distribution drops, the manufacturer sells more units for the same wholesale price, raises the wholesale price to capture the gains, or does a little of each. A manufacturer can gain by increasing the gap between wholesale and resale price only if the retailer supplies services that are worth more than the increase in the cost of distribution. In the cigarette business, retailers furnish at least one important service: advertising. Cigarette manufacturers lack access to television and radio, billboards, many magazines, and some other normal promotional channels. That increases the importance of point-of-sale signs, placards, and other attention-getting devices. And manufacturers are willing to pay for these through selective wholesale discounts. The more a retailer promises to do in promoting a product, the lower the wholesale price.

Manufacturers also reduce wholesale prices in order to match (and sometimes exceed) price reductions by rivals. Reynolds perceives that it must meet or beat the price for Marlboro cigarettes, the market's leading brand. Marlboro, produced by Philip Morris, accounts for about one-third of all cigarette sales in the United States; all of Reynolds's brands combined, by contrast, account for only 25% of

domestic sales. Cigarettes Cheaper! made life difficult for Reynolds and its retailers by charging particularly low prices for Marlboro cigarettes, having negotiated with Philip Morris a contract that afforded it very low wholesale prices in exchange for extensive signage and other promotional services. Reynolds contends that this was an "exclusive" contract that prevented Cigarettes Cheaper! from offering the same level of promotion to any other producer and says that this is why it was unwilling to give Cigarettes Cheaper! its lowest-price-for-highest-promotion package; Cigarettes Cheaper! denies that its deal with Philip Morris deserves the label "exclusive" but allows that it did require especially prominent signs and vigorous promotion of the Marlboro brand and afforded Philip Morris some weeks when other firms' brands could not be promoted.

The district court concluded that Reynolds's 25% share of the cigarette market is too small to create market power. That decision is both questionable and irrelevant. It is questionable as an empirical matter because the record (which on summary judgment must be construed favorably to Cigarettes Cheaper!) does not demonstrate that Reynolds lacks power to make significant price increases without substantial loss in sales. The cigarette market is concentrated (the Herfindahl-Hirschmann Index exceeds 3,000); new entry is difficult if not impossible; customers perceive quality differences among brands (so that a price increase for one brand does not immediately divert customers to rivals); Reynolds's own discounting practices show that it regularly changes price substantially without creating dramatic swings in its sales. See generally William M. Landes & Richard A. Posner, *Market Power in Antitrust Cases*, 94 Harv. L. Rev. 937 (1981); George J. Stigler & Robert A. Sherwin, *The Extent of the Market*, 28 J.L. & Econ. 555 (1985). The Supreme Court has found market power in circumstances more favorable to the defendant. See *United States v. Philadelphia National Bank*, 374 U.S.

321 (1963). What's more, the subject may be irrelevant if, as Cigarettes Cheaper! maintains, Reynolds has engineered (or serves as an agent of) a horizontal conspiracy among retail dealers, for then market power need not be shown. See *United States v. Socony-Vacuum Oil Co.*, 310 U.S. 150, 224 n.59 (1940).

This does not lead to a remand for trial, however, for Cigarettes Cheaper! must surmount additional hurdles. It is doubtful that Cigarettes Cheaper! suffers antitrust injury: the discounts to rivals of which it complains are beneficial to consumers. See *Atlantic Richfield Co. v. USA Petroleum Co.*, 495 U.S. 328 (1990); *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477 (1977). Because Reynolds has not argued this point, however (a passing citation to *Atlantic Richfield* is short of focused argument), and it does not affect subject-matter jurisdiction (for Cigarettes Cheaper! suffers injury in fact, even if not the sort of injury that the antitrust laws guard against), we bypass this subject in favor of the topics on which issue has been joined. We ask first whether Cigarettes Cheaper! has a good claim if Reynolds acted unilaterally, and next whether evidence supports Cigarettes Cheaper!'s argument that a horizontal conspiracy was formed.

Reynolds gave other retailers discounts that it denied to Cigarettes Cheaper!. That creates a claim under the Robinson-Patman Act, which we take up in Part II. So far as the Sherman Act is concerned, however, there's nothing wrong with price discrimination. See, e.g., *Schor v. Abbott Laboratories*, No. 05-3344 (7th Cir. July 26, 2006), slip op. 3; *In re Brand Name Prescription Drugs Antitrust Litigation*, 186 F.3d 781 (7th Cir. 1999). The problem is not discrimination (exemplified by lower prices to favored customers) today, but monopoly and higher prices tomorrow if the pricing scheme knocks firms out of the market and prevents new entry. Antitrust also has a framework for

assessing claims that low prices today will produce monopoly tomorrow: predatory pricing.

To make out a predatory-pricing claim, the plaintiff must establish not only that the defendant has sold products below cost but also that exit from the market has occurred or is imminent, enabling the aggressor to recoup by setting monopoly prices that injure consumers. See *Brooke Group Ltd. v. Brown & Williamson Tobacco Corp.*, 509 U.S. 209 (1993); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986). Yet Cigarettes Cheaper! does not contend that Reynolds sold to any dealer below *any* measure of cost (sparing us the need to determine which is the appropriate measure). Nor does it contend that it has been knocked out of the market or is in imminent danger of leaving. Cf. *Spectrum Sports, Inc. v. McQuillan*, 506 U.S. 447 (1993). In 2000 Cigarettes Cheaper! signed a retail contract with Reynolds and has been selling legitimate domestic cigarettes ever since, enjoying Reynolds's discounts.

Not that any one firm's departure from retail sales would enable Reynolds or its favored customers to recoup: There are so many cigarette retailers, and entry into retail sales is so easy, that the market approximates economists' vision of perfect competition. To the extent Cigarettes Cheaper! invites us to rule in its favor without insisting that the requirements of a good predatory-pricing claim have been met, we are unwilling to oblige; price cutting is expensive enough to producers without adding antitrust risks. See *Monahan's Marine, Inc. v. Boston Whaler, Inc.*, 866 F.2d 525, 527-28 (1st Cir. 1989) (Breyer, J.); see also Bruce Kobayashi, *The Economics of Loyalty Discounts and Antitrust Law in the United States*, 1 Comp. Policy Int. 115 (2005); Herbert Hovenkamp, *The Law of Exclusionary Pricing*, University of Iowa Legal Studies Research Paper 05-34 (Jan. 2006).

Instead of proffering evidence about the likely economic effect of Reynolds's selective discounts, Cigarettes Cheaper! wanted to regale a jury with evidence that its retail rivals (and perhaps Reynolds too) intended to deal it a fatal blow. One memo, for example, discusses ways to "shut down" and "kill" Cigarettes Cheaper! "on the beach" (though presumably without machine guns and tank traps). Cigarettes Cheaper! found plenty of such tidbits in discovery. Cigarettes Cheaper! sold Marlboros for less than many outlets sold Camels and Winstons; neither Reynolds nor its retail outlets were willing to take this lying down. They responded with discounts of their own and generated reams of paper expressing unhappiness about the need to do so.

Yet as we remark frequently in antitrust litigation, "cutthroat competition" is a term of praise rather than condemnation. Joseph Schumpeter called capitalism a "gale of creative destruction." *Capitalism, Socialism and Democracy* 84 (3d ed. 1950). Businesses need not love their rivals (or firms that compete with their customers); consumers gain when firms try to "kill" the competition and take as much business as they can. See, e.g., *Israel Travel Advisory Service, Inc. v. Israel Identity Tours, Inc.*, 61 F.3d 1250, 1255-56 (7th Cir. 1995); *A.A. Poultry Farms, Inc. v. Rose Acre Farms, Inc.*, 881 F.2d 1396, 1403-04 (7th Cir. 1989); *Schachar v. American Academy of Ophthalmology, Inc.*, 870 F.2d 397, 399 (7th Cir. 1989). The question is not whether the defendant has tried to knock out other businesses but whether the means it has employed to that end are likely to benefit or injure consumers. Cigarettes Cheaper! accused Reynolds of using a means— lower prices—that usually if not always brings benefits to consumers.

Organizing firms into a cartel, however, injures consumers, and Cigarettes Cheaper! maintains that Reynolds has organized the retail dealers in this way. Why it would do any such thing is a mystery. As we've observed already, producers gain when the costs of distribution

are lowest; a retail cartel that charged a monopoly price for distribution services would hurt Reynolds as well as (if not more than) ultimate consumers, so it is a surprise to see Reynolds accused of facilitating its own injury. Members of a retail cartel might be able to compensate a producer that organizes and coordinates their group, but there is no sign of compensation: Cigarettes Cheaper! complains about discounts that Reynolds gives to other retailers, not about a hike in the wholesale price that might imply compensation. See *Toys "R" Us, Inc. v. FTC*, 221 F.3d 928, 932-34 (7th Cir. 2000); cf. *Denny's Marina, Inc. v. Renfro Products, Inc.*, 8 F.3d 1217 (7th Cir. 1993).

Concrete evidence that Reynolds has played the role of cat's paw in a retail conspiracy would suffice even if it was hard to understand the motivation. Nothing to which Cigarettes Cheaper! has pointed in this voluminous record shows, however, that there is an agreement at the retail level. And it is evidence, not allegations, on which the appeal turns. Unlike *Twombly v. Bell Atlantic Corp.*, 425 F.3d 99 (2d Cir. 2005), cert. granted, 126 S. Ct. 2965 (2006), in which the district court dismissed a complaint for lack of evidentiary detail about a potential conspiracy, this case proceeded through discovery and was decided on summary judgment; the complaint is no longer relevant.

At oral argument we asked Cigarettes Cheaper!'s counsel to highlight the best evidence for the proposition that Reynolds orchestrated a horizontal agreement. None of the evidence to which our attention was directed would allow a reasonable jury to infer that there was any horizontal agreement. Take, for example, a document on which Cigarettes Cheaper! harps in its brief. Someone at Vons Groceries prepared a memorandum showing that Vons is worried about losing business to Cigarettes Cheaper! and wants to "keep Cigarettes Cheaper! from their required carton volume" and "defeat [Cigarettes Cheaper!'s] format." The memorandum discusses what Vons sees as weaknesses

in Cigarettes Cheaper!'s business model and proposes to exploit those weaknesses to achieve what the author in a flight of fancy calls "a degree of pricing invincibility". The memo continues: "Once results are achieved Vons/Pavilions slowly over time will reduce VonsClub discounts back to normal Vons/Pavilions retail pricing". The document tells us that "RJR will underwrite $3.80 per carton and 20 cents per pack for these brands as long as Vons maintains a $1.00 advantage over Marlboro and a 20 cent advantage over Marlboro packs." In other words, Reynolds reduced its price so that Vons could sell RJR-brand cigarettes for $1.00 a carton (or 20¢ a pack) less than what Vons (not Cigarettes Cheaper!) charged for Marlboro products. Whatever this memo shows about Vons hopes, it does not suggest that there was any horizontal conspiracy. Nothing in the record implies that the memo was seen or acted on by any other retailer. For its part, Reynolds had every right, under antitrust law, to condition discounts on agreement by its customers to reduce the prices they charged to consumers. See *State Oil Co. v. Khan*, 522 U.S. 3 (1997).

Another of Cigarettes Cheaper!'s featured documents is a memorandum that one of Reynolds's employees wrote about the firm's dealings with Albertson's, another retailer. Counsel highlighted this language:

> We have established a program to offer buydown [= discount] support in Albertson's stores in direct competition with Cheaper Stores. . . . Albertson's stores are matching Cheapers prices on all brands except Camel and Winston where we have a $.50 per carton advantage on Marlboro. . . . [In some stores] Marlboro [has] a price advantage on us. We met with Albertson's about this matter this week . . . . As information, Albertson's is very pleased with their overall cigarette sales.

Emphasis omitted. That a retailer is "pleased" with its ability to sell more after receiving a price reduction is

obvious and does not imply any agreement to raise prices in the future. One of Albertson's executives testified at a deposition that in one market prices fell when Cigarettes Cheaper! entered and returned to prior levels when its store closed; once again this morsel would not permit a reasonable jury to find that there was a retail conspiracy (or any probability of recouping losses sustained during a discounting campaign, for a return of price to a pre-discounting competitive level differs from elevation of price to a cartel level).

We could traipse through other documents from the record, but there is no need. These documents are Cigarettes Cheaper!'s best evidence; nothing else we have seen is any more favorable. The district court properly granted summary judgment against Cigarettes Cheaper!'s claim under the Sherman Act.

## II

Reynolds sold to other retailers for less than it sold to Cigarettes Cheaper!; this threw on Reynolds the burden to establish a justification. 15 U.S.C. §13(b). Reynolds offered several: it maintained, for example, that the lower prices were as available to Cigarettes Cheaper! as to any other retailer (all it had to do was stop selling gray market cigarettes and provide Reynolds with in-store placards and other support equal to what Cigarettes Cheaper! gave to Philip Morris products) and that the discounts to other retailers were necessary to meet competition from Philip Morris, Lorillard, Liggett, and a handful of smaller producers. The jury was persuaded by these defenses.

According to Cigarettes Cheaper! the five-week trial, long as it was, actually was far too abbreviated. Cigarettes Cheaper! wanted to introduce the "intent" evidence that we have discussed briefly. The district judge excluded it.

The Robinson-Patman Act prohibits certain price differences; a bad intent is not part of the plaintiff's *prima facie* case under §13(a), and a "good" intent (apart from its bearing on the statutory justifications) does not excuse price discrimination. Even if marginally relevant to some issue (which we doubt), the sort of evidence that Cigarettes Cheaper! wanted to introduce could have played little role beyond confusing jurors who, not being professional economists, may not have understood that markets respond to deeds rather than thoughts or hopes or words. Keeping this evidence out enabled the court to focus jurors' attention on the statutory requirements and defenses. The district judge sensibly relied on Fed. R. Evid. 403, which authorizes the exclusion of evidence whose tendency to create prejudice substantially outweighs any benefit; this was not an abuse of discretion.

Trying another tack, Cigarettes Cheaper! proposed to use this evidence to impeach Reynolds's witnesses, some of whom testified (as part of Reynolds's theory that the discounts were available to any outlet) that Reynolds would have been happy to cooperate with Cigarettes Cheaper!, the better to sell more cigarettes. This led to the response that Reynolds wanted to "kill" rather than "help" Cigarettes Cheaper!. The district judge should have kept *all* claims about motive or intent out of evidence; whether Reynolds was "trying to help" Cigarettes Cheaper! or just engaging in grudging compliance with its legal obligations is neither here nor there. The instructions did not call on the jury to resolve any dispute about the intent with which Reynolds acted. This means that any error in not allowing impeachment on the subject of intent was harmless.

There is one dispute about instructions. The judge told the jury:

> The law does not require RJR to meet competition
> on a customer-by-customer basis. Rather, RJR can

meet competition on a broader basis so long as its action was a genuine, reasonable response to prevailing competitive circumstances in the marketplace. That is, RJR must simply show that its offer of lower prices or greater allowances was reasonably tailored to the competitive situation that it realistically faced in the marketplace.

According to Cigarettes Cheaper!, this statement is erroneous because, if all the defendant must do is show that the market is generally competitive, then the Robinson-Patman Act might as well be repealed. That's why the statute "places emphasis on individual competitive situations, rather than upon a general system of competition.*"* *FTC v. A.E. Staley Mfg. Co.*, 324 U.S. 746, 753 (1945); see also, e.g., *Great Atlantic & Pacific Tea Co. v. FTC*, 440 U.S. 69 (1979); *Hoover Color Corp. v. Bayer Corp.*, 199 F.3d 160, 165 (4th Cir. 1999).

Although this instruction could have been misunderstood to embody the mistake that Cigarettes Cheaper! highlights, that would not have been a plausible reading. Another instruction told the jury that to prevail on a meeting-competition defense Reynolds had to establish that the prices it was meeting were available to customers from another source. It would not be sound to read the challenged instruction as taking back that limitation.

Reynolds did not argue "this market is rivalrous" and stop. Instead it maintained that discounts on Winstons and other brands were generally available to retailers because Philip Morris made *its* discounts generally available. If producer A makes a generally available offer, then a generally available response meets the competition. The Robinson-Patman Act favors general price schedules, see *Falls City Industries, Inc. v. Vanco Beverage, Inc.*, 460 U.S. 428, 450-51 (1983), and the district judge did not err in providing the jury with this information in a concise

instruction. Cigarettes Cheaper! would have a sounder point if it had proposed language to distinguish "general competition" from "generally available price schedules," but it did not do so and cannot blame the judge for failing to come up with language unaided.

**III**

At last we arrive where the case began: the trademark claim. Apart from formalities, it is easy to see why Reynolds cares about the reimportation of cigarettes initially sold abroad. Cigarettes Cheaper! perceives the lower price of foreign cigarettes as yet another form of price discrimination, but from Reynolds's perspective the price difference reflects a cost difference. Tort litigation and the tobacco settlement between the states and the cigarette industry impose a substantial cost (equivalent to an excise tax) on every pack of cigarettes sold in the United States. Reynolds must charge more for domestic product to cover this cost; to sell domestic and foreign product at the same price would be a form of economic price discrimination and would cripple Reynolds in competition with foreign producers that do not bear the extra costs of selling tobacco in the United States. Reimporting cigarettes originally sold abroad exposes Reynolds to the U.S. litigation tax without compensation. It turned to the Lanham Act to find a means to keep domestic and foreign markets separate.

The Lanham Act does not block the reimportation and sale of genuine articles under their real trademarks. See *NEC Electronics v. CAL Circuit Abco*, 810 F.2d 1506 (9th Cir. 1987). But this principle does not apply if the domestic and foreign products are materially different, for then sale of the foreign product in the United States under the domestic marks has a potential to mislead or confuse consumers about the nature or quality of the product they are buying; they will assume it to be the same as

the normal domestic product and be disappointed. See *Lever Brothers Co. v. United States*, 877 F.2d 101 (D.C. Cir. 1989), 981 F.2d 1330 (D.C. Cir. 1993); *Société Des Produits Nestlé, S.A. v. Casa Helvetia, Inc.*, 982 F.2d 633, 641 (1st Cir. 1992). Reynolds's principal argument therefore has been that the cigarettes it sells abroad are materially different from those it sells in the United States under the same brands.

Reynolds initially maintained that the distinguishing factors included differences in the cigarettes' additives and taste. That led Cigarettes Cheaper! to demand detailed disclosures about what, exactly, is in Reynolds's cigarettes here and abroad. Rather than reveal documents that it believes to be trade secrets, Reynolds withdrew this contention—except with regard to Winston, for, in the United States, Reynolds sells that brand under a representation that it contains nothing other than tobacco and water. The district court issued a protective order foreclosing discovery about additives except with respect to Winstons, and then only on the question whether it contains any additive at all. At trial the district court excluded the sort of evidence that had been placed outside the scope of discovery. Reynolds then argued that the existence of some additives made foreign-market Winstons materially different from the domestic product and that all of the brands differed with respect to loyalty programs (domestic Camels packages, for example, include coupons called "C-Notes" that can be collected and redeemed for merchandise) and post-manufacturing quality control (domestic cigarettes are inspected and removed from sale at the end of their shelf life; reimported gray market products are not).

Although Cigarettes Cheaper! allows that the evidence permitted the jury to find material differences with respect to all of the brands, it maintains that the verdict is suspect because the jury may have assumed that there were unstated differences in additives and taste. To avoid such a

possibility, Cigarettes Cheaper! contends, it should have been allowed to conduct discovery and introduce evidence about the products' additives. That proposes a graymail tactic in defense of gray market sales. Additives were not relevant to the trial (except with respect to Winstons); "taste" was not relevant to any of the trademarks. The jury was told to confine its attention to the arguments that were made at trial.

The only function of the argument that Cigarettes Cheaper! makes now would have been either to force Reynolds to reveal trade secrets as the price of enforcing its trademarks, or to forego protection of the Lanham Act in order to retain its trade secrets. The district judge did not abuse his discretion in deflecting that tactic. Reynolds had to pay a price to keep its secrets: it abandoned any contention that additives and taste differentiated domestic and foreign products; having prevailed (by default) on those issues, Cigarettes Cheaper! was not entitled to any other relief. (Cigarettes Cheaper! does insist that "taste" should have been relevant to Winstons, but that's wrong; given the marketing of domestic Winstons as additive-free, the existence of additives in product initially sold abroad was material whether or not consumers could smell the difference. The palette is hardly the only part of the body affected by the contents of cigarette smoke.)

It seems that we cannot escape arguments about intent. Cigarettes Cheaper! maintains that in order to reduce the damages it should have been allowed to introduce evidence that it acted in "good faith" when selling the gray market cigarettes—and one aspect of this "good faith," according to Cigarettes Cheaper!, is that "internal RJR documents show[ ] that RJR thought" the sale of reimported cigarettes to be lawful. This illustrates one of the problems potentially caused by comprehensive discovery. A large firm such as Reynolds, with thousands of employees, generates mountains of internal paper. Some of the employees are

bound to take almost any view about almost every subject. Yet only the CEO and Board of Directors speak for Reynolds; that one or more subordinates reached one or another conclusion does not demonstrate that "RJR thought" anything in particular, let alone that it was reasonable for Cigarettes Cheaper! to have thought the same thing (if indeed it did). The district judge sensibly prevented an excursion through Reynolds's files, which would have hijacked this trial.

Indeed, the judge properly excluded most of the "intent" evidence that Cigarettes Cheaper! proposed to offer—though the judge allowed some, Fed. R. Evid. 403 permitted him to set limits to avoid waste of time. Mental states are no defense to *actual* damages, which is all the jury awarded. (There was a separate "wilful dilution" finding, but it turned out not to affect damages.) If Cigarettes Cheaper! had wanted to make a serious stand on the issue of good faith or reasonable mistake, it should have allowed the jury to learn the advice its lawyers furnished about the propriety of selling reimported cigarettes bearing domestic trademarks. When Reynolds sought to learn what legal advice Cigarettes Cheaper! had received, however, it was met with an invocation of the attorney-client privilege. Cigarettes Cheaper! had every right to take that position, but having done so it could hardly insist that other, potentially unreliable, indicators of its executives' thinking be paraded before the jury.

The tail end of Cigarettes Cheaper!'s brief complains about no fewer than five of the instructions given to the jury. The arguments are undeveloped (not a single case is cited, and the brief does not explain why the district judge ruled as he did) and forfeited.

AFFIRMED

No. 05-1456                                              17

A true Copy:

Teste:

                        _____
                        *Clerk of the United States Court of*
                        *Appeals for the Seventh Circuit*